IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**RUTH H. WELLS, ARLEN GLENN WELLS, JR., and NANCY L. INMAN,**

    **Plaintiffs,**

v.                                         **CIVIL ACTION NO. 1:20CV9**
                                                              (Judge Keeley)

**ANTERO RESOURCES CORPORATION,**

    **Defendant.**

**MEMORANDUM OPINION AND ORDER DENYING THE PARTIES'
MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 50, 51]**

Pending are the parties' competing motions for summary judgment. For the reasons that follow, the Court **DENIES** the motions (Dkt. Nos. 50, 51).

### I.  Background

**A.  Factual History**

The Plaintiffs, Ruth Wells, Arlen Wells, Jr., and Nancy Inman (collectively, "the Plaintiffs"), own an undivided one-fourth (1/4) interest in the mineral estate beneath 450 acres located in Doddridge County, West Virginia ("the Subject Property") (Dkt. No. 1-1 at 1).[1] Their interest is subject to an oil and gas lease dated June 13, 1961 ("the 1961 Lease") to which the defendant, Antero Resources Corporation ("Antero"), is the successor-in-interest.

---

[1] Ruth Wells is the life estate owner of this interest and her children, Arlen Wells, Jr. and Nancy Inman, are the remaindermen. (Dkt. No. 53-12).

Id. at 2. Of significance to this case, the 1961 lease does not contemplate the pooling or unitization of the Subject Property. Id. at 14.

In 2014, Antero approached the Plaintiffs about modifying the 1961 Lease to allow Antero to combine the Subject Property with adjacent properties into horizontal production units (Dkt. No. 53 at 2). Shortly thereafter, however, due to its erroneous review of property records, Antero ceased negotiations with the Plaintiffs and obtained a modification agreement permitting the pooling and unitization of the Subject Property from Rosemary Haught. Id. In early 2018, Antero included the Subject Property in its Buffett, Jimmy, Northrop, Convair, and Walker Units, which collectively encompass twelve (12) Marcellus wells. Id.[2]

In 2019, Antero discovered that it should have obtained the lease modification from Ruth Wells, not Rosemary Haught. Id. Therefore, in March 2019, it obtained an executed division order[3]

---

[2] Of the Plaintiffs' 450 acres, 216.36 were included in the Jimmy Unit, 36.37 were included in the Buffet Unit, 107.96 were included in the Northrop Unit, 82.59 were included in the Convair Unit, and 6.72 were included in the Walker Unit (Dkt. No. 1-1 at 4-6).

[3] A "division order" alters lease provisions concerning royalty distribution. Imperial Colliery Co. v. Oxy USA Inc., 912 F.2d 696, 700-01 (4th Cir. 1990) (citing 4 H. WILLIAMS, OIL & GAS LAW § 701, 572 (1988)). These orders typically state the individuals entitled to receive payment for natural gas or oil, the price to be paid, and the time and manner of payment. See 4 SUMMERS OIL AND GAS § 40:1 (3d Ed.).

**MEMORANDUM OPINION AND ORDER DENYING THE PARTIES'
MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 50, 51]**

("the Division Order") from Ruth Wells, in which she agreed to accept royalty payments for the oil and gas extracted from the portion of the Subject Property included in Antero's Walker Unit (Dkt. No. 52-2). Notably, the Division Order "[did] not amend any lease or operating agreement between [Antero and the Plaintiffs] for the purchase of oil or gas." Id.

On April 9, 2019, Antero sent a letter to the Plaintiffs requesting that they modify the 1961 Lease to permit Antero to pool the Subject Property with adjacent properties in order to allow oil and gas to be extracted from the Subject Property by horizontal drilling (Dkt. No. 52-1). Although the Plaintiffs denied Antero's request to modify their lease, Antero continued to produce and sell oil and gas extracted from the production units, including from the Subject Property (Dkt. Nos. 52 at 3, 53-11).

From March 2019 through September 2019, Antero deposited a total of $5,683.19 in royalty payments directly into Ruth Wells's bank account for its pooled production from the Walker Unit dating back to March 1, 2018 (Dkt. No. 53-11).[4] Also, in August and September 2019, Antero deposited royalty payments into her account for pooled production from its Jimmy and Buffet Units for

---

[4] Antero obtained Ruth Wells's bank account information during an unrelated transaction (Dkt. No. 52 at 3).

production dating back to November 1, 2018.[5] Id. In total, Antero paid the Plaintiffs $612,254.45 in royalties. Significantly, it calculated these royalty payments based on the pro rata share of the acreage of the Subject Property included in the Walker, Jimmy, and Buffett Units, not upon the Subject Property's actual contributions to these units (Dkt. Nos. 52 at 3, 53 at 3). Antero sent monthly emails to Ruth Wells containing a link to her royalty statements (Dkt. No. 53 at 7).

On August 23, 2019, by counsel, the Plaintiffs, wrote to Antero demanding that it "immediately cease" pooled production from the Subject Property because it had no express or implied authority to use such production method (Dkt. No. 52-4 at 2). They also sought an accounting of the oil and gas Antero had extracted from the Subject Property, and payment for past production according to the terms of the 1961 Lease. Finally, they "reject[ed] any and all royalty payments made in accordance with pooled production." Id.

Following that, the parties exchanged several letters asserting their respective positions. Antero contended that it had the right to pool the Subject Property under the 1961 Lease and

---

[5] Although Antero states that the Plaintiffs received royalty payments for the Jimmy and Buffet Units as early as March 2019, its accounting records show that its first payment to them from these units occurred in August 2019. Id.

the Division Order (Dkt. No. 53-15). The Plaintiffs, by contrast, maintained they were owed royalties based on the amount of oil and gas actually extracted from the Subject Property (Dkt. No. 53-14). They demanded that Antero suspend any further royalty payments based on pooled production and offered to return any overpayment of royalties. In response, Antero suspended payments to the Plaintiffs, notified them of the total amount previously paid for pooled production, and provided instructions for returning the payments (Dkt. No. 53-15).

### B.   Procedural History

The Plaintiffs never returned those previously paid royalties. Instead, on December 16, 2019, they filed a complaint in the Circuit Court of Doddridge County, West Virginia, asserting a single breach of contract claim (Dkt. No. 1-1). Antero timely removed the case to this Court on January 14, 2020 (Dkt. No. 1).

During discovery, the Court granted Antero's motion to exclude the testimony of the Plaintiffs' damages expert, Daniel Fisher ("Fisher"), who had been retained to calculate the quantity of oil and gas produced from the Subject Property versus the total quantity of oil and gas produced from the production units (Dkt. Nos. 43, 34 at 2-3). Although the Plaintiffs intended to rely on that data at trial to compute their actual damages, the Court excluded Fisher's testimony after concluding that he was not

qualified to offer expert opinions on royalty calculations, and that his novel methodology was unreliable (Dkt. No. 43).

Following the conclusion of discovery, the parties filed cross motions for summary judgment (Dkt. Nos. 50, 51). As these are now fully briefed and ripe for review, the Court turns to address the issues raised in the motions.

## II. Standard of Review

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling on a motion for summary judgment, the Court reviews all the evidence "in the light most favorable" to the nonmoving party. Providence Square Accocs., L.L.C. v. G.D.F., Inc., 211 F.3d 846, 850 (4th Cir. 2000). The Court must avoid weighing the evidence or determining its truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has made the

necessary showing, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment; the evidence must be such that a rational trier of fact could reasonably find for the nonmoving party. Id. at 248-52.

"When faced with cross-motions for summary judgment, the court must review each motion on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n. 4 (1st Cir.1997)). The same standards of review apply when both parties file motions for summary judgment. See ITCO Corp. v. Michelin Tire Corp., 722 F.2d 42, 45 n. 3 (4th Cir. 1983) ("The court is not permitted to resolve genuine issues of material facts on a motion for summary judgment—even where ... both parties have filed cross motions for summary judgment").

### III. Applicable Law

Under West Virginia law, "[a]n oil and gas lease is both a conveyance and a contract." Syl. Pt. 2, Ascent Res. - Marcellus, LLC v. Huffman, 851 S.E.2d 782 (W. Va. 2020). Thus, contract law principles also apply to oil and gas leases. K&D Holdings, LLC v. Equitrans, L.P., 812 F.3d 333, 339 (4th Cir. 2015) (citing Energy

Dev. Corp. v. Moss, 591 S.E. 2d 135, 143 (W. Va. 2003). "A claim for breach of contract requires proof of the formation of a contract, a breach of the terms of that contract, and resulting damages." Syl. Pt. 1, State ex rel. Thornhill Grp., Inc. v. King, 759 S.E.2d 795 (W. Va. 2014).

To prevail on their motion, the Plaintiffs must establish the following three elements: "(1) a contract exists between the parties; (2) a defendant failed to comply with a term in the contract; and (3) damage arose from the breach." Wittenberg v. Wells Fargo Bank, N.A., 852 F. Supp. 2d 731, 749 (N.D.W. Va. 2012). Antero, on the other hand, must establish the inverse of at least one of these elements.

### IV. Discussion

The Plaintiffs contend that Antero materially breached the 1961 Lease by improperly producing and selling oil and gas extracted from horizontal production units that pass through their property despite having no express or implied right to do so (Dkt. No. 51). Antero asserts that this claim fails as a matter of law because the Plaintiffs cannot prove damages resulting from Antero's alleged breach. Alternatively, it asserts several defenses to the breach of contract claim premised on Ruth Wells's execution of the Division Order and retention of royalties from pooled production (Dkt. No. 50).

**MEMORANDUM OPINION AND ORDER DENYING THE PARTIES'**
**MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 50, 51]**

After considering the parties' arguments and evidentiary submissions, as discussed below, the Court concludes that there are genuine questions of material fact regarding Antero's alleged breach of contract and the Plaintiffs' resulting damages that preclude summary judgment.

### A. Whether Antero breached the 1961 Lease

The parties dispute (1) whether Antero breached the 1961 Lease and (2) whether Antero has any valid defense to the Plaintiffs' breach of contract claim.

#### 1. Antero has no express or implied right to pool the Plaintiffs' mineral interest under the 1961 Lease

The Plaintiffs correctly contend that Antero had no express or implied right to pool their mineral interest with adjoining landowners' mineral interests under either the 1961 Lease or West Virginia law (Dkt. No. 52 at 5-7).

"A valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent." Syl. Pt. 3, Est. of Tawney v. Columbia Nat. Res., L.L.C., 633 S.E. 2d 22 (W. Va. 2006). Where the instrument is an oil and gas lease, it is interpreted and construed as of the date of its execution. Syl. Pt. 4, Ascent, 851 S.E.2d at 783. The right to pool a lessor's mineral interest must be expressly granted in an oil and gas lease. Id. Where the lease

is silent as to pooling or unitization, the lease is not ambiguous and there is no implied right to pool or unitize a lessor's mineral interest to promote more efficient production. Id. at 788.

Here, the 1961 Lease is an unambiguous contract that must be construed as of June 13, 1961. It is silent as to pooling and unitization and therefore does not expressly grant Antero the right to pool the Plaintiffs' mineral interests with adjacent landowners' interests. Nor does West Virginia law grant Antero the implied right to do so. Ascent, 851 S.E.2d 782.

### 2. Antero's defenses to the Plaintiffs' breach of contract claim

Although neither the 1961 Lease nor West Virginia law grants Antero the right to pool the Plaintiffs' mineral interests, the parties dispute whether Antero has any valid defense to the Plaintiffs' breach of contract claim under the doctrines of ratification, waiver, and quasi-estoppel. Several questions of material fact exist regarding these defenses.

#### a. Ratification

First, Antero contends that the Plaintiffs ratified its inclusion of the Subject Property in production units through Ruth Wells's execution of the Division Order and acceptance of royalties from pooled production (Dkt. No. 53 at 6-7). "Ratification of a contract may be found where a party intentionally accepts or

retains the benefits of an invalid contract with full knowledge of the facts that make the contract voidable." 17A C.J.S. Contracts § 185; see also Hamilton v. McCall Drilling Co., 50 S.E.2d 482, 484 (W. Va. 1948). "[R]atification of a contract is a matter of intent." Tri-State Petroleum Corp. v. Coyne, 814 S.E.2d 205, 220 (W. Va. 2018).

Here, it is unclear whether Ruth Wells intended to allow Antero to pool the entire Subject Property when she signed the Division Order, which references only the Walker Unit. The Plaintiffs have not signed a similar order for any other production unit. The Division Order also expressly states that it did not amend any existing lease between the parties. Significantly, following the execution of the Division Order, Antero sought a modification of the 1961 lease to permit pooling. Moreover, it is uncertain whether Ruth Wells had full knowledge of the relevant facts when she signed the Division Order, including that Antero had already included the entire Subject Property in its production units, and that production had begun nearly a year before the Division Order was executed.

There also is a question as to whether the Plaintiffs ratified Antero's pooled production by receiving and retaining royalty payments. Although it is uncontested that Antero directly deposited $612,254.45 into Ruth Wells's bank account for royalties

based on pooled production from the Walker, Jimmy, and Buffet Units and that the Plaintiffs have retained these payments, there is a question as to when the Plaintiffs knew or should have known that the deposited royalties were from pooled production from a unit other than the Walker Unit.

It is also unclear whether the Plaintiffs intended to ratify Antero's pooling when they failed to return their royalty payments. The Plaintiffs contend that when they discovered that these payments were based on pooled production, they sent a cease and desist letter, requested that Antero suspend further payments, and filed this lawsuit. But, because they never returned the royalty payments despite being instructed by Antero as to how to do so, material questions of fact remain regarding their intent that will need to be presented to a jury.

    **b.   Waiver**

Antero also contends that by her conduct Ruth Wells waived the Plaintiffs' breach of contract claim (Dkt. No. 53 at 8-9). Waiver is the voluntary, intentional relinquishment of a known right. Bruce McDonald Holding Co. v. Addington, Inc., 825 S.E.2d 779, 787 (W. Va. 2019). The essential elements of a waiver include: (1) the existence of a right at the time of the waiver; (2) actual or constructive knowledge of the existence of the right; and (3) intentional relinquishment of such right. Id. at Syl. Pt. 4.

**MEMORANDUM OPINION AND ORDER DENYING THE PARTIES'
MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 50, 51]**

This defense again raises questions regarding the Plaintiffs' intent. Antero must establish that, through their conduct, the Plaintiffs intentionally relinquished their right to have their mineral interest separately developed and to receive royalty payments under the terms of the 1961 Lease. A reasonable jury, however, could find that Ruth Wells did not intend to relinquish this right for the entire Subject Property, or that she even understood that the Division Order could have this effect where it contained no reference to any production unit other than the Walker Unit and specifically stated that it did not amend the 1961 Lease.

A jury also could find that the Plaintiffs did not intend to relinquish these rights by retaining royalty payments for pooled production. After Antero began paying Ruth Wells royalties for pooled production from the Jimmy and Buffet Units in August 2019 the Plaintiffs objected. Then, in December 2019, after attempting to negotiate with Antero, the Plaintiffs brought this breach of contract action but never returned royalties previously paid by Antero. Accordingly, there are genuine issues of material fact regarding whether the Plaintiffs intended to waive their breach of contract claim, or retained those royalty payments because they believed they were entitled to them based on Antero's production of oil and gas from the Subject Property.

 **c. Quasi-estoppel**

 Finally, Antero contends that the Plaintiffs' retention of royalties from pooled production bars their breach of contract claim (Dkt. No. 53 at 9-10). The Supreme Court of Appeals of West Virginia has acknowledged the doctrine of quasi-estoppel just once in a footnote, stating that the doctrine operates to "preclude a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by him." Petition of Shiflett, 490 S.E.2d 902, 909 n.26 (W. Va. 1997).

 Antero argues "that one who accepts payment pursuant to a lease is estopped from denying that the lease exists or challenging the terms therein" (Dkt. No. 54 at 13). In support, it cites Blair v. Dickenson, 54 S.E.2d 828, 848 (W. Va. 1949), which held that a party who accepted coal mining royalty payments under a lease was estopped from later repudiating the lease, and Headley v. Hoopengarner, 55 S.E. 744, 745-46 (W. Va. 1906), in which a plaintiff was estopped from claiming greater rights under his original lease than those to which he had agreed in a lease modification.

 These cases do not resolve the issues in dispute in this case. The Plaintiffs state that they are not attempting to repudiate the 1961 Lease, nor are they challenging its terms after receiving

royalties paid in accord with its terms. Furthermore, they are not asserting rights greater than those granted under the 1961 Lease.

Antero has not established beyond debate that the Plaintiffs' retention of royalty payments is inconsistent with their subsequent challenge to pooled production from the Subject Property. According to the Plaintiffs, they inquired into the nature of the payments soon after their receipt of the payments, demanded that Antero cease pooled production and make no further payments to them for pooled production, and filed this breach of contract action.

**B.   Whether Antero is liable for damages**

Significant questions of material fact also exist as to whether the Plaintiffs are entitled to damages for Antero's alleged breach of the 1961 Lease. Even if the Plaintiffs can establish that Antero breached the 1961 Lease, Antero contends they cannot prove actual damages because the Court excluded their expert's testimony and they have no other evidence to support their claim (Dkt. No. 53 at 11). The Plaintiffs, however, assert that they are at least entitled to nominal damages based on Antero's conduct (Dkt. No. 55 at 6).[6]

---

[6] The Plaintiffs also assert that they are entitled to damages in the form of attorney fees and costs. However, attorney fees ordinarily are not recoverable in contract actions. McCormick v. Allstate Ins. Co., 475 S.E.2d 507, 513 (W. Va. 1996) (collecting

**MEMORANDUM OPINION AND ORDER DENYING THE PARTIES'
MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 50, 51]**

Damages in a breach of contract action must be proved to a reasonable certainty. Kentucky Fried Chicken of Morgantown, Inc. v. Sellaro, 214 S.E.2d 823, 828 (W. Va. 1975). However, "[w]here a mere breach of contract is shown, without actual damage calling for compensation, nominal damages may be recovered from the mere fact of such breach of contract." Syl. Pt. 6, Douglass v. Ohio River R. Co., 41 S.E. 911, 912 (W. Va. 1902). Nominal damages are recoverable even if actual damages are "not susceptible of proof" or are "too remote, conjectural, and speculative to form the basis of a legal recovery." 22 Am. Jur. 2d Damages § 17; Wilson v. Wiggin, 87 S.E. 92, 93 (W. Va. 1915) ("Where no sufficient data is afforded whereby a jury may with reasonable certainty ascertain the requisite compensation for the breach, recovery therefor can be nominal only.").

Here, even if the Plaintiffs are ultimately unable to prove their actual damages to a reasonable certainty at trial, they may still be entitled to nominal damages as aggrieved parties in a breach of contract action. Therefore, a genuine question of material fact exists as to whether, if Antero did breach the 1961

---

cases). And this action is not one of the rare cases that would meet the "essential to equity" exception to this rule. See Rolax v. Atlantic Coast Line R.R. Co., 186 F.2d 473 (4th Cir. 1951).

Lease, it is liable to the Plaintiffs for at least nominal damages, and if so, in what amount.

## V. Conclusion

For the reasons discussed, the Court **DENIES** the parties' cross motions for summary judgment (Dkt. Nos. 50, 51). The case shall proceed to trial as scheduled (Dkt. No. 49).

It is so **ORDERED**.

The Clerk **SHALL** transmit copies of this Memorandum Opinion and Order to counsel of record.

DATED: April 16, 2021.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE
